(85 App. Div. 178.)

PEOPLE ex rel. BROOKLYN RAPID TRANSIT CO. v. MILLER, Comptroller of State.

(Supreme Court, Appellate Division, Third Department. June 30, 1903.)

1. TAXATION—CORPORATIONS—BANK DEPOSITS—TAXATION AS CAPITAL.

Relator was a domestic corporation organized for the purpose of "holding securities and stocks of street railroad companies and furnishing capital for construction thereof." It had a bonded indebtedness of $7,000,-000, and carried large sums of money on deposit in various banks to meet the semiannual interest on such indebtedness, and taxes and incidental expenses. The largest part of the money on deposit in a certain month was obtained by the sale of the bonds of a certain street railway, and was intended in part to be expended by relator on the property owned by that company. The money in the various banks constituted a general balance, and no part of it was ever separated by relator as idle, uninvested, or unemployed funds. *Held*, that the determination of the Comptroller that the money in the various banks constituted a part of relator's capital on which the franchise tax should be computed would not be disturbed.

Certiorari by the people, on the relation of the Brooklyn Rapid Transit Company, against Nathan C. Miller, as Comptroller of the state of New York. Determination of Comptroller confirmed.

Certiorari issued out of the Supreme Court, and attested on the 30th day of June, 1902, directed to Nathan L. Miller, as Comptroller of the state of New York, commanding him to certify and return to the office of the clerk of the county of Albany the proceedings, evidence, documents, records, papers, and decision on the application of the relator for the revision and readjustment of the corporation franchise tax imposed upon it for the year ending October 31, 1901.

The relator is a domestic corporation organized January 17, 1896, under the business corporations law. The purposes for which the corporation is formed, as stated in its certificate of incorporation, are "the construction, extension, repair, improvement, equipment of, and furnishing the motive power for, railroads and other works, and aiding any corporation or individual in such construction, extension, repair, improvement, equipment and furnishing of motive power." The certificate of incorporation also contains a provision as follows: "The said corporation shall be authorized to purchase, acquire, hold and dispose of the stocks, bonds and other evidences of indebtedness of any corporation, domestic or foreign, and issue in exchange therefor its stock, bonds, or other obligations."

The report of the company to the Comptroller for the year ending October 31, 1901, shows that it had at that time an authorized capital of $45,000,000, divided into shares of $100 each, and that the whole number of shares of stock authorized had been issued.

The report to the Comptroller consisted of questions and answers, and the sixteenth and eighteenth questions, together with the statements in explanation thereof and the answers given thereto, are as follows:

"16. The business transacted by this company in the state of New York for the year ending October 31st, 1901, was as follows, viz.: (Give nature of business and how carried on.) Holding securities and stocks of street railroad companies and furnishing capital for construction thereon, etc."

"18. Capital stock employed in New York state ........................

"(Preceding line need not be filled out by companies whose capital is all employed in this State.)"

During said year the balance of cash held by said company at the end of each month was as follows:

| | |
|---|---|
| November 30, 1900 ............................................ | $ 216,201 30 |
| December 31 ................. ........................ | 226,851 92 |
| January 31, 1901 ......................................... | 191,771 92 |
| February 28 ............................................. | 475,211 34 |
| March 31 ............................................... | 309,567 17 |
| April 30 ............................................... | 3,641,280 61 |
| May 31 ................................................. | 3,603,803 29 |
| June 30 ................................................ | 3,550,377 90 |
| July 31 ................................................ | 3,498,103 55 |
| August 31 .............................................. | 3,498,151 88 |
| September 30 ........................................... | 3,324,151 88. |
| October 31 ............................................. | 3,039,521 77 |

Further facts appear in the opinion.

Argued before PARKER, P. J., and SMITH, CHASE, CHESTER, and HOUGHTON, JJ.

Sheehan & Collin (Charles A. Collin, of counsel), for appellant.

John Cunneen, Atty. Gen., and William H. Wood, Dep. Atty. Gen., for respondent.

CHASE, J. The only contention in this court is whether the relators' average bank balance for the year ending October 31, 1901, is capital employed within this state.

It has been repeatedly held that a reasonable amount of cash held for use in the ordinary course of business of a corporation is a part of its capital, on which a franchise tax should be paid. The relator contends that the amount of cash deposited by it in banks during the year was largely in excess of its requirements, and that the amount thereof, less an average of $100,000, should be deducted from the amount of the capital on which the franchise tax was computed. The relator had a bonded indebtedness of $7,000,000, and it was necessary for it to have money to pay the semiannual interest on such indebtedness, and it was also necessary for it to have money to pay taxes and incidental expenses. While the company did not have a salary list or pay roll, and did not own or run a railroad, and did not require money in the ordinary course of its business for running expenses, like a transportation corporation, it appears that it owned large amounts of stock of numerous street railroad corporations, and had furnished and was furnishing such street railroad corporations money for construction, which it carried as a charge against said corporations, under the head of "Construction Advances," as a part of its capital. To "purchase, acquire, hold and dispose of the stocks, bonds and other evidences of indebtedness of any corporation," made the temporary holding of

large sums in cash necessary, and to be expected, in the ordinary course of its business.

The express purposes for which the company was formed was to construct, extend, repair, improve, equip, and furnish motive power for railroads and other works, and aid corporations and individuals in such construction, extension, repair, improvement, equipment, and furnishing of motive power; and the exercise of its said corporate duties, in connection with its interests as shown by the amount of its capital stock and its investments, would require that it have at ready command a large amount of cash for immediate use. The largest part of the bank balance shown during the year was obtained in April by the sale of bonds owned by the relator, which were a part of a larger amount of bonds taken in a transaction a part of which consisted of a contract on the part of the relator to expend $1,500,000 on the property owned by the company whose bonds the relator had acquired. The money received from the bonds sold in April was in part intended to be used in carrying out that contract, and at the end of said year relator had paid thereon $660,000, and there was owing on that contract $840,000, which contract was then in the process of completion. The cash on hand at the end of each month, although distributed among several banks, was a general balance, and the relator never separated any part of it as idle, uninvested, or unemployed funds. It appears that at the time of the hearing before the Comptroller (April 16, 1902) at least two-thirds of the balance on hand at the end of the year had been actually expended in new construction of railroads in which the relator was largely interested. All the bonds sold in April, 1901, "were originally acquired with the intention of selling them when the time was right in order to acquire funds for investing in railroad properties." They were doubtless sold by the relator because "the time was right," and also because the money was desired for use from time to time in carrying out its contracts and in continuing the work for which it was expressly organized. Under the peculiar statement of the purposes for which the relator was organized, it is difficult, in fixing the franchise tax, to distinguish any real difference between an amount temporarily in bank drawing interest and a similar amount invested in interest-bearing bonds given by some of the companies in which the relator was interested. The Comptroller has found that the cash held by the relator in different banks as stated was a part of the capital on which the franchise tax should be computed, and we cannot say that he was in error in such determination.

The determination of the Comptroller should be confirmed, with $50 costs and disbursements. All concur.